Filed 3/3/15  P. v. Ramirez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ELEAZAR RAMIREZ,<br><br>    Defendant and Appellant. | F067605<br><br>(Super. Ct. No. F11901432)<br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Houry A. Sanderson, Judge.

James Bisnow, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Lewis A. Martinez and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Gomes, Acting P.J., Poochigian, J. and Detjen, J.

## PROCEDURAL SUMMARY

Appellant, Eleazar Ramirez, was charged in an information filed on October 7, 2011, with two counts of carjacking (Pen. Code, § 215, subd. (a), counts 1 and 3) (undesignated statutory references are to the Penal Code), assault with a firearm (§ 245, subd. (a)(2), count 2), possession of a firearm by a felon (§ 12021, subd. (a)(1), count 4), possession of ammunition by a felon (§ 12316, subd. (b)(1), count 5), and felony evasion of a peace officer (Veh. Code, § 2800.2, subd. (a)). The information alleged that appellant used a gun in the commission of both carjacking counts (§ 12022.53, subd. (b)) and, as to count 1, appellant discharged a firearm during the commission of that offense (§ 12022.53, subd. (c)). Count 2 alleged that appellant personally used a gun while committing an assault with a firearm (§ 12022.5, subd. (a)).

The information had special allegations that appellant had two prior serious felony convictions pursuant to the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), qualified for a prior serious felony enhancement (§ 667, subd. (a)), and qualified for a prior prison term enhancement (§ 667.5, subd. (b)). At the conclusion of a jury trial on June 7, 2013, appellant was convicted of all six counts and the jury found true all of the gun enhancement allegations. In a bifurcated proceeding, appellant waived his right to a jury trial on the special allegations and admitted the prior serious felony convictions, the prior serious felony enhancement, and the prior prison term enhancement.

On July 8, 2013, the trial court sentenced appellant to consecutive indeterminate sentences of 25 years to life for carjacking as alleged in counts 1 and 3. The court sentenced appellant to consecutive determinate sentences of 20 years for discharging a firearm in the commission of count 1 pursuant to section 12022.53, subdivision (c), a term of 10 years for the section 12022.53, subdivision (b) enhancement on count 3,[1] a

---

[1] The abstract of judgment has a typographical error indicating that the gun use enhancement in count 3 was pursuant to subdivision (c) of section 12022.53. This is a clerical error that can be corrected at any time. (*People v. Mitchell* (2001) 26 Cal.4th

2.

term of five years for the prior serious felony enhancement on count 1, a term of five years for the prior serious felony enhancement on count 3, and a term of six years on count 6. The court stayed appellant's sentences on the remaining counts and allegations. Appellant's total indeterminate sentence is 50 years to life; his total determinate sentence is 46 years. Appellant received custody credits for time actually in prison of 850 days, plus conduct credits of 127 days, for total custody credits of 977 days.

Appellant contends the trial court erred in denying his motion to remove a juror who he alleges was guilty of prejudicial misconduct prior to jury deliberations, denying him a fair trial and an impartial jury. We reject appellant's contention and affirm the judgment.

## FACTS

### First Carjacking

On March 3, 2011,[2] Lazaro Cantu met Christine Northrup, a friend and coworker, in Fresno's Tower District for an Art Hop event. They then went to a Thai restaurant on Olive Avenue for dinner about 10:00 p.m. The two arrived in separate cars. Cantu drove his mother's car, a 2005 gray Toyota Camry, which was parked in a different location than Northrup's car.

Cantu walked with Northrup back to his car and was placing leftover food in the backseat when Northrup motioned to him that someone was coming toward them. When Cantu looked up, appellant approached him, pointed a gun at Cantu's abdomen, and said he was taking the car. Cantu got scared and reacted by trying to push the gun down and away from his body. Appellant pulled back and struggled with Cantu over control of the gun. The two men went up against a fence. Appellant bit Cantu's arm until Cantu let go

---

181, 185; *In re Candelario* (1970) 3 Cal.3d 702, 705.) We will remand for the trial court to amend the abstract of judgment.

[2] Unless otherwise noted, all date references are to the year 2011.

of the gun. Appellant threw Cantu to the ground, fell to the ground himself, and the two men struggled. Both men had hold of the gun, but Cantu held only the barrel, not the trigger.

Cantu was pushing or holding the gun above his head when he heard it fire a round. With the gun directly in his face, Cantu heard a "snap" sound. Northrup heard a round go off and also heard a bullet spark, or ricochet, off the street. Northrup heard a second "click" noise, but no bullet was fired from the gun. After the misfire, appellant told Cantu something to the effect that it should have been Cantu's head. With the gun pointed at his face, Cantu held up his hands and asked appellant to calm down. Appellant demanded the car keys and told Cantu to toss them over to him. Cantu tossed the keys to appellant, Cantu and Northrup ran away, and appellant drove away in the Camry.

Cantu clearly saw appellant's face because there was a streetlight where he was assaulted. Cantu saw tattoos on appellant, especially one on the left side of appellant's neck.

After looking at a first photo lineup, Cantu did not see appellant in any of the photographs. In a second photo lineup, Cantu was able to identify appellant.

*Second Carjacking*

Jesus Guerrero was at a coin-operated car wash cleaning his 1993 blue/green Honda Civic on March 12. As Guerrero was about to finish, appellant walked up and pointed a gun at Guerrero. Appellant demanded the keys to the Honda. Guerrero told him the keys were in the car. Appellant motioned for Guerrero to leave and then drove away in the Honda. Guerrero was able to identify appellant in a photo lineup because he recognized appellant's eyes.

Guerrero ran to a nearby Carl's Jr. restaurant and had someone call 911. Police Officer Ryan Stockdale responded to the car wash and found a light-colored Toyota Camry that appellant reportedly left at the scene. When Stockdale ran the license plate number of the Camry, he learned it had been stolen in the Cantu carjacking.

4.

Police tracked appellant using Guerrero's cell phone, which was still in the Honda. Officers found the Honda parked, set up a loose surveillance, and waited until appellant got back into the vehicle and started driving it. Officers began to move in on the Honda. When an officer activated his forward solid red light, flashing front lights, and siren, appellant accelerated away rather than pulling over.

Appellant was driving fast and recklessly through town with patrol units in hot pursuit until officers attempted to immobilize the Honda by ramming into it. Although the impact caused the Honda to spin out, appellant again accelerated the car and continued to flee. Appellant eventually drove the Honda into a cul-de-sac and crashed it into a fence. Two officers pursued appellant on foot. Appellant disposed of his gun during the chase but it was later recovered.

Appellant was eventually apprehended. Officers found a gray cloth bag containing seven live rounds of .22-caliber ammunition, a Toyota key and key fob, paperwork from a car dealership with Cantu's name and address on it, and a piece of paper with Cantu's name on it that also had appellant's fingerprint.

### Defense

Officer Lisa Maldonado testified that she assisted in the investigation of the March 3 carjacking. Northrup gave a general account of appellant approaching them, demanding the keys to Cantu's car, and then pulling out a gun and pointing it at Cantu. Northrup told Maldonado that the assailant fired the gun twice and she believed the assailant was trying to scare Cantu into giving up his car keys. Maldonado canvassed the area for shell casings and looked for strike marks on the street where the bullet may have hit, but found nothing.

*Elevator Comment by Juror No. 9*

After the close of evidence, but prior to jury instructions and closing arguments, Juror No. 9 (Juror 9)[3] made a comment about defense counsel in the elevator that was heard by a court employee. The court employee sent an e-mail message to the court clerk explaining that she heard a juror say that she "was surprised that they didn't offer up a defense, I hope he didn't pay too much for that." The court conducted a hearing outside the presence of the full jury with Juror 9 to determine what was said and whether Juror 9 could remain impartial.

The court asked Juror 9 if she recalled a conversation in the elevator earlier in the day referencing the case with remarks about the defense. Juror 9 replied that she was trying to remember being in the elevator and could not recall. The court again asked Juror 9 if she said something about appellant not offering up a defense and her hope that appellant did not pay too much for that. Juror 9 replied, "You know, possibly, but I don't really recall it. It's possible. It sounds kind of --" She also said a man who sat behind her in the jury box was also on the elevator. Juror 9 did not remember if there was another woman on the elevator.

The court asked Juror 9 if she understood that she was not to "consider whether or not the defense has put on any evidence because they have the absolute right to rely on the case as presented by the People. And they are not obligated to put on one witness. You understand that?" Juror 9 replied, "I do."

The court further admonished Juror 9 that she could not "wonder about it. You cannot speculate about it. And interjecting that into your thoughts at this hour where we are ready to go into deliberation mode in a few hours' time or tomorrow morning at the latest is completely inappropriate. It is inappropriate any other time while you're a juror

---

**3** Juror 9's badge number ended with the numbers "16" and she was also referred to in the hearing as "**16."

also. Are you able to give us your word that you will only consider the evidence and follow through with my instructions as I direct you and not any other information or thoughts or any other conjecture that you have about this case? Can you do that?" Juror 9 replied, " I will only -- yes. I will just consider what was presented and nothing else." When asked if she could be "fair and impartial to both sides and not come to any conclusions until you start deliberating with the other jurors," Juror 9 replied, "I can." Juror 9 reiterated that she did not really recall what she said.

Juror No. 5 (Juror 5) testified that he was in the elevator with jurors talking about a case. The court asked Juror 5 if he remembered a conversation concerning why the defense had not offered a defense and the person speaking making references about hoping defendant did not pay too much for that. Juror 5 responded, "Maybe." When asked if the statement was directed to him, Juror 5 replied that he assumed the statement was directed to him, the discussion could have been about this case, and there were just a couple of words spoken.

The court asked Juror 5 if he understood that as a juror he was under oath to follow the court's instructions and not discuss the case outside the deliberation room. Juror 5 responded, "I haven't." Juror 5 further indicated that he understood he could not discuss the case with other jurors outside of jury deliberations. Juror 5 indicated there was nothing in the conversation in the elevator that would cause him to be less than fair and impartial. Juror 5 indicated that the conversation in the elevator happened only between him and Juror 9. Juror 5 promised not to discuss the hearing with other jurors.

Defense counsel made a motion to replace Juror 9. The e-mail from the court employee to the court's clerk was preserved as an exhibit. The court noted that Juror 5 was using a listening device in court and did not have such a device with him in the elevator because he apparently did not own his listening device. The court noted no other known juror from the instant action was on the elevator. The court found that Juror 9 expressed a desire to continue to serve and to be a fair and impartial juror who would

7.

consider only the evidence that was presented. The court noted its admonishment to Juror 9 that she not speculate on subjects not before the jury.

The court further noted that Juror 9's statement and its tone suggested sympathy toward the defense, not animosity. The court denied appellant's motion to replace Juror 9.

**PREJUDICIAL JUROR MISCONDUCT**

Appellant contends that the trial court erred in denying his motion to substitute Juror 9 with an alternate juror. Appellant argues that Juror 9's comments in the elevator showed prejudice and denied him a fair trial. Appellant characterizes Juror 9's testimony as a lie. Appellant reasons that Juror 9's failure to remember what she said during the hearing before the trial court, even though she had made her comments within 24 hours of the hearing, indicates Juror 9's statements that she would follow the court's instructions and be objective lacked credibility.

When a juror, or a jury, violates the trial court's instruction not to discuss the defendant's failure to testify, the juror or jury has committed misconduct. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1425.) Such misconduct gives rise to a presumption of prejudice, which may be rebutted, by a reviewing court's determination upon examining the entire record that there is no substantial likelihood the complaining party suffered actual harm. (*Ibid.*; *People v. Hardy* (1992) 2 Cal.4th 86, 174.) A similar standard is applied to allegations of juror bias. (*People v. Danks* (2004) 32 Cal.4th 269, 303 (*Danks*); *People v. Nesler* (1997) 16 Cal.4th 561, 582-583 (*Nesler*).)

We accept the trial court's credibility determinations and findings of historical fact if supported by substantial evidence. (*Danks*, *supra*, 32 Cal.4th at pp. 303-304; *People v. Mendoza* (2000) 24 Cal.4th 130, 195.) Whether the prejudice arose from juror misconduct is a mixed question of law and fact subject to the appellate court's independent determination. (*Nesler*, *supra*, 16 Cal.4th at p. 582.)

Juror misconduct during jury deliberations, for instance noting a defendant's failure to testify, is not prejudicial where the alleged improper statement or discussion is not lengthy or significant. The misconduct can be overcome when, in addition, the offending juror is immediately reminded that he or she cannot consider this factor and the discussion ceases. (*People v. Avila* (2009) 46 Cal.4th 680, 727 (*Avila*).) "'Transitory comments of wonderment and curiosity' about a defendant's failure to testify, although technically misconduct, 'are normally innocuous.'" This is particularly so when a comment stands alone without further discussion. (*Ibid.*; see *People v. Hord* (1993) 15 Cal.App.4th 711, 727-728 (*Hord*).)

In *Hord*, several jurors during deliberations discussed why the defendant did not take the witness stand to testify. The foreperson reminded the jury that whether or not the defendant testified had no bearing on his guilt or innocence and was not to be considered in the decisionmaking process. All further discussion on that point stopped. (*Hord*, *supra*, 15 Cal.App.4th at pp. 721-722.) *Hord* held that there was no prejudice to the defendant under those circumstances and found the discussion to be transitory comments of wonderment and curiosity. (*Id.* at pp. 727-728.)

In analyzing Juror 9's comments in the elevator, we begin with the presumption that the comments constituted misconduct. We next review the record to determine whether the presumption of prejudice was rebutted. In doing so, we give deference to the trial court's factfinding of the historical record.

Appellant contends that Juror 9's credibility was undermined because she appeared not to remember her comments, although they were recently made. Appellant interprets Juror 9's testimony as a lie. We find this interpretation to be unduly harsh. Juror 9 did not deny making a statement in the elevator, admitted it was possible, and stated she could not recall the statement. Juror 9's lack of recollection of her exact statement appeared to show contrition and could be attributed to simple forgetfulness. If Juror 9 was forgetful, her comment was only a casual observation.

The trial court observed Juror 9's demeanor concerning what was said in the elevator and determined that she was being genuine when she promised to follow the court's instructions. The trial court even viewed Juror 9's comments as demonstrating sympathy rather than antagonism for defendant. The trial court could directly evaluate Juror 9's testimony, as well as her demeanor. There are explanations for Juror 9's failure to remember her comments in the elevator besides deception. The trial court could discern sincerity from Juror 9's demeanor. Because we cannot evaluate Juror 9's demeanor from the hearing transcript, we defer to the trial court's factual findings at the conclusion of the hearing.

Furthermore, viewing the entire record, we find on balance that Juror 9's comments were transitory statements of wonderment and curiosity and that she was not harboring a deep-seated prejudice against defendant. We agree with the People's argument that Juror 9's comments do not rise to the level of misconduct of the several jurors in *Hord* who commented on that defendant's failure to testify. Juror 9's comments appear to be in the more benign category of transitory statements of wonderment and curiosity.

Appellant argues that this case is worse than other cases where jury misconduct was held not to be prejudicial or not found to be misconduct. In *People v. Linton* (2013) 56 Cal.4th 1146, 1193-1195, a juror vented to her husband about the case, did not tell him the facts of the case, expressed confusion over something in the case, and told the court her husband did not respond to her comments. The juror told the court that she could be a fair and impartial juror. The defendant in *Linton* posited that the juror was lying. The Supreme Court held that the juror's "venting" to her husband and her confusion did not amount to misconduct. (*Id*. at p. 1195.)

*People v. Loot* (1998) 63 Cal.App.4th 694, 697-698 found it improper for a juror to ask the prosecutor if he was married during an elevator ride, but found the defendant

failed to show a "'demonstrable reality'" of the juror's inability to perform the functions of a juror.

In *People v. Stewart* (2004) 33 Cal.4th 425, 509-510, the Supreme Court found misconduct by a juror only trifling. In *Stewart*, the juror complimented the defendant's girlfriend, who was also a witness, for being attractive. We find the facts of this case to be analogous to those in *Linton*, *Loot*, and *Stewart*. We also disagree with appellant that Juror 9's transgressions "far outweighed" those of the jurors in *Linton*, *Loot*, and *Stewart*.

We further find that the trial court carefully admonished Juror 9 (and Juror 5 as well) to be an impartial fact finder, to not speculate about matters not in evidence, and to deliberate with the other jurors. Juror 9 assured the trial court that she could do these things. Again, we must defer to the trial court's evaluation of Juror 9's demeanor and sincerity during the hearing. There is no evidence in the record that this matter came up again or that Juror 9 made any other inappropriate comment or speculation. (*Avila*, *supra*, 46 Cal.4th at p. 727; *Hord*, *supra*, 15 Cal.App.4th at pp. 727-728.)

As in *Hord*, the alleged misconduct was corrected by the trial court's admonitions to Juror 9. The misconduct in this case was not as egregious as in *Hord* because it did not occur during deliberations, and only Juror 5 could have heard the comments, although with his hearing difficulties it is more likely that he did not even hear the comments. If Juror 5 did hear Juror 9's comments, the trial court specifically instructed him to disregard them.

The trial court also instructed the jury on defendant's absolute constitutional right not to testify (CALCRIM No. 355), that neither side was required to call witnesses or to produce all the physical evidence that may be relevant (CALCRIM No. 300), and the duty of the jury not to let bias, sympathy, or public opinion influence their decision (CALCRIM No. 200). The trial court's specific admonitions to Juror 9, as well as its specific instructions to the entire jury, were at least as effective, if not more so, as the foreperson's reminder to his fellow jurors in the *Hord* case that they were not to speculate

11.

on the defendant's failure to testify at trial.  (*Hord*, *supra*, 15 Cal.App.4th at pp. 727-728.)  We conclude that there is no substantial likelihood that appellant suffered prejudice as a result of Juror 9's comments in the elevator.

## DISPOSITION

The case is remanded for the trial court to amend the abstract of judgment to show that the gun use enhancement imposed on count 3 was for a violation of section 12022.53, subdivision (b).  The trial court shall forward the amended abstract of judgment to the appropriate authorities.  The judgment is affirmed.